## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WEICHEN G. LUI, Individually and On Behalf of All Others Similarly Situated, ) ) ) | **CIVIL ACTION NO. 07-CV-8766-JGK** |
| Plaintiff, ) ) | "ECF CASE" |
| vs. ) ) | |
| LDK SOLAR CO., LTD., XIAOFENG PENG, XINGXUE TONG, LIANGBAO ZHU, YONGGANG SHAO, GANG WANG, LOUIS T. HSIEH, JACK LAI, NICOLA SARNO, YUEPENG WAN, RONGQIANG CUI, PIETRO ROSSETTO, QIQIANG YAO, ) ) ) ) ) ) | AMENDED CLASS ACTION COMPLAINT |
| ) | |
| Defendants. ) ) | **JURY TRIAL DEMANDED** |

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by LDK Solar Co., Ltd. ("LDK" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, as well as information provided by a confidential source. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1. This is a class action on behalf of purchasers of the publicly traded securities of LDK between June 1, 2007 and October 8, 2007 (the "Class Period"), inclusive, excluding defendants and their privies, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

5.     In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, Weichen G. Lui, as set forth in the accompanying certification, incorporated by reference herein, purchased LDK securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant LDK was incorporated in the Cayman Islands on May 1, 2006 for the purpose of acquiring all of the equity interests in the Company's wholly owned subsidiary, Jiangxi LDK Solar ("Jiangxi").  Jiangxi, LDK's principal operating subsidiary, was established in the People's Republic of China on July 5, 2005.  The Company's principal executive offices

–2–

are located at Xinyu Hi-Tech Industrial Park, Xinyu City, Jiangxi Province, People's Republic of China. American Depository Shares of LDK are traded on the New York Stock Exchange. These ADSs were initially offered to the public on June 1, 2007. LDK sold 13,392,100 ADSs of LDK at $27.00 per ADS in the offering.

8.      Defendant Xiaofeng Peng is the Company's founder and was at all relevant times the Company's Chairman of the Board and Chief Executive Officer. Prior to the Company's June 1, 2007 initial public offering, Peng beneficially owned 82.8% of the Company's outstanding shares.

9.      Defendant Xingxue Tong was at all relevant times the Company's President and Chief Operating Officer.

10.     Defendant Liangbao Zhu was at all relevant times a director of the Company and a senior vice president of operations.

11.     Defendant Yonggang Shao was at all relevant times a director of the Company and a senior vice president of corporate strategy.

12.     Defendant Gang Wang was at all relevant times a director of the Company.

13.     Defendant Louis T. Hsieh was at all relevant times a director of the Company.

14.     Defendant Jack Lai was at all relevant times the Chief Financial Officer of the Company and was an executive vice president and secretary.

15.     Defendant Nicola Sarno was at all relevant times the senior vice president of manufacturing and the plant manager of the Company.

16.     Defendant Yuepeng Wan was at all relevant times the Chief Technology Officer of the Company.

17.    Defendants Peng, Tong, Zhu, Shao, Wang, Hsieh, Lai, Sarno, and Wan are collectively referred to hereinafter as the "Individual Defendants."

18.    Defendants Peng, Tong, and Lai, by reason of their management positions and membership and ownership of the Company's stock, were at all relevant times controlling persons of LDK within the meaning of Section 20(a) of the Exchange Act. These defendants had the power and influence to cause LDK to engage in the unlawful acts and conduct alleged herein, and did exercise such power and influence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of LDK between June 1, 2007, and October 8, 2007, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers, and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any defendant has or had a controlling interest.

20.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, LDK's securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by LDK or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that custom-

arily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of LDK; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

25.    LDK commenced commercial production of solar wafers in April 2006 at a manufacturing facility in Xinyu City, Jiangxi Province, People's Republic of China.  LDK produces and sells multicrystalline solar wafers to manufacturers of photovoltaic products, including solar cells and solar modules, both in and outside of China.

26.    In addition, LDK provides wafer processing services to monocrystalline and multicrystalline solar cell and module manufacturers. LDK also sells polysilicon materials, including ingots and polysilicon scraps.

27.    Solar wafers are thin sheets of crystalline silicon material primarily made by slicing multicrystalline ingots or monocrystalline boules.

28.    Solar wafers are the principal raw material used to produce solar cells, which are devices capable of converting sunlight to electricity.

29.    Polysilicon feedstock is an essential raw material used in manufacturing solar wafers.

## SUBSTANTIVE ALLEGATIONS

**A.    LDK's Inventory Was Significantly Overstated**

30.    On May 11, 2007, LDK filed a Form F-1 Registration Statement with the SEC ("Form F-1"). Form F-1 is used for the registration under the Securities Act of 1933 of securities of all foreign private issuers.  The May 11, 2007 Form F-1 was signed by Peng, Tong, Zhu, Shao, Wang, Lai, and Yao.

31.    The Risk Factors section of the Form F-1 on page 10 stated, *inter alia*:

Failure to secure sufficient quantities of polysilicon feedstock on commercially reasonable terms could adversely affect our results of operations and impede our business expansion plans:

Solar-grade polysilicon feedstock is an essential raw material in manufacturing our multicrystalline solar wafers. Our operations depend on our ability to procure sufficient quantities of solar-grade polysilicon on a timely basis and on commercially reasonable terms. Polysilicon is also an essential raw material for the semiconductor industry, which requires polysilicon of higher purity than that for the solar industry. The significant growth of the solar wafer industry and the competing demand and buying power of the semiconductor industry have resulted in an industry-wide shortage in solar-grade polysilicon and a significant increase in solar-grade polysilicon price over the past few years. According to Solarbuzz, the average price of virgin polysilicon under long-term supply contracts increased from approximately $35 to $40 per kilogram delivered in 2005 to $50 to $55 per kilogram delivered in 2006, and are expected to further increase to $200 per kilogram in 2007 and $225 per kilogram in 2008. **Currently, we have polysilicon inventories and supply commitments that we believe will satisfy over 90% of our estimated polysilicon requirements for 2007 . . .** (Emphasis added).

32.    The Overview of Management's Discussion and Analysis of Financial Condition and Results of Operations on page 42 of the Form F-1 stated, *inter alia*:

**As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 MW.** According to our current expansion plan, we intend to continue to increase our annual production capacity, which we expect to reach approximately 400 MW by the end of 2007 and approximately 800 MW by the end of 2008. **Despite the current industry-wide shortage of polysilicon, we believe that our polysilicon feedstock inventory and commitments from suppliers are sufficient to satisfy over 90% of our estimated requirements for 2007.** (Emphasis added).

33.    LDK's Consolidated Balance Sheet on page F-3 states that as of December 31, 2006, LDK had total assets of $292,719,000, including $94,886,000 in inventories.

34.    Note 3 – Inventories on page F-17, states that LDK inventories consisted of $79,496,000 in raw materials, $8,884,000 in work in progress, $1,410,000 in supplies, and $5,096,000 in finished goods.

35.     LDK's Consolidated Balance Sheet on page F-42 states that as of March 31, 2007,
LDK had total assets of $340,825,000, including $114,205,000 in inventories.

36.     Note 3 – Inventories on page F-49 states that LDK inventories consisted of
$93,914,000 in raw materials, $11,192,000 in work in progress, $2,020,000 in supplies, and
$7,079,000 in finished goods.

37.     As set forth in further detail below, the above statements in the Form F-1 were
false and misleading when made because:

(a) the Company had significantly less feedstock inventory than it claimed to
have; and

(b) only a fraction of the feedstock inventory that the Company did have was of
sufficient quality for use in the manufacture of silicone wafers.

38.     On or about September 25, 2007, Charley Situ, LDK's Financial Controller,
resigned. Mr. Situ's resignation letter stated that LDK's financial systems and data were
unreliable, and that as a result there were discrepancies between the financial statements released
by the Company and the Company's actual operations. Mr. Situ's letter noted that a financial
analysis and internal audit of the feedstock in LDK's warehouse as of August 31, 2007 made a
number of "critical findings."

39.     For example, Mr. Situ stated that LDK's warehouse feedstock ledger was verified
and consistent with the feedstock in the Company's warehouse, while in contrast, the amount of
feed-stock inventory listed on LDK's accounting books was 85.88% more than the amount
actually in the warehouse.

40.     In addition, only 13.64% of the feed-stock inventory that LDK actually had was of

–8–

sufficient quality to be used in the manufacture of silicone wafers.

41.    Accordingly, in truth, during the Class Period, the Company only had 7.34% of the inventory it claimed to have in its Form F-1.  This discrepancy caused LDK's total assets to be overstated by as much as $92,000,000.

42.    In addition, the Company's possession of only 7.34% of the feed-stock inventory that it publicly claimed to possess caused the following statements in the Form F-1 to be false and misleading:

(a)    "As of March 31, 2007, we had an annual multicrystalline wafer production capacity of approximately 215 MW," Form F-1, p. 42;

(b)    "Despite the current industry-wide shortage of polysilicon, we have inventory and commitments from suppliers that we believe will satisfy over 90% of our estimated requirements through the end of 2007," Form F-1, p. 42; and

(c)    "Currently, we have polysilicon inventories and supply commitments that we believe will satisfy over 90% of our estimated polysilicon requirements for 2007," Form F-1, p. 10.

**B.    LDK's Internal Financial Data Conflicted with Its Public Financial Statements**

43.    LDK's Form F-1, p. 57, in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, reported the following:

> For the three months ended March 31, 2007, our net sales were approximately $73.4 million, representing an increase of $11.5 million from our net sales of $61.9 million for the three months ended December 31, 2006.  This increase was primarily due to our increased sales volume, which was offset in part by a decline in our average wafer selling price.  We sold 29.6 MW of wafers during the three months ended March 31, 2007 and 26.4 MW of wafers during the three months ended December 31, 2006.

44.     The sales figures reported in the Form F-1 are unreliable. As early as May 2007, defendant Lai, LDK's CFO, noted that an internal management report stated that LDK had sold 39.6 MW of wafers during the three months ended March 31, 2007, not the 29.6 MW reported in the Form F-1. In an email to defendant Lai, dated May 29, 2007, Mr. Situ noted that an investigation into the discrepancy found that the Company's reporting systems could not be reconciled, and that neither figure could be verified.

45.     According to Mr. Situ's email, a separate management report to Morgan Stanley reported sales of 45 MW of wafers during the same period.

46.     In addition, Mr. Situ's email states that LDK's sales returns were also a serious issue for the Company. Mr. Situ states that in July 2007, defendant Lai reported to defendant Peng, LDK's CEO, that the Company's sales returns had averaged 6.1% in the previous six months, with the return figure for May as high as 12%. Further, according to Mr. Situ this information was concealed in the Company's financial statement for the second quarter of 2007.

### The Truth Begins To Be Revealed

47.     On October 3, 2007, Piper Jaffray stated in a research note that "[w]e have confirmed that the LDK financial controller recently left the company," and "[w]e are also aware of the former controller's allegations of poor financial controls and a 250-tonne inventory discrepancy."

48.     In reaction to this news, LDK ADSs closed at $51.65 on October 3, down 24.4% from the previous day's close.

49.     On October 4, 2007, LDK issued a press release via PR NEWSWIRE stating:

A few days ago, a former financial staff member of LDK, Charley Situ, who was terminated for cause on September 25, 2007, sent email letters to LDK's management and others subsequent to his termination alleging inconsistencies in LDK's inventory reporting.  Mr. Situ was originally hired as a Financial Controller in March, 2007, reporting to Qiqiang Yao, LDK's Vice President and Chief Accounting Officer, who reports to Jack Lai, Executive Vice President and Chief Financial Officer.  In response to the allegations and in accordance with instructions of the board of directors, LDK's management team and board of directors formed an internal committee to investigate the allegations and conduct an immediate physical inventory of LDK's polysilicon materials.  The management team found no material discrepancies as compared to LDK's financial statements.  The management team believes that these allegations have no merit.  Additionally, the Audit Committee has asked an independent auditing firm to conduct a separate, independent engagement on LDK's inventory.  These findings are expected to be disclosed after the completion of the review and consideration of the Audit Committee.  LDK has not been contacted by any regulatory authority regarding this matter.

50.    In reaction to this news, LDK ADSs closed at $48.30 on October 4, 2007, down 6.5% from the previous day's close and 29.3% from the closing price on October 2, 2007.

51.    On October 8, 2007, BLOOMBERG news reported, in pertinent part, that:

LDK Solar Co. fell the most since its U.S. initial public offering in May after BARRON's reported that the Chinese maker of materials used to produce solar cells may be overstating earnings and the value of its inventories

*      *      *

The quality of LDK's silicon ingots is so low that a recent production run produced tons of them that were too contaminated for technicians to analyze, BARRON's said, citing a person with knowledge of the company's manufacturing.  LDK's inventories may be overvalued by as much as $92 million, BARRON's reported, citing a resignation letter from the company's former financial controller, Charley Situ.

52.    In reaction to this news, LDK ADSs closed at $37.50 on October 8, 2007, down 26.4% from the day before and 45.7% from October 2, 2007.

## SCIENTER ALLEGATIONS

53.    As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially

false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.    According to Mr. Situ's emails, defendant Lai was aware of the discrepancy between the Company's actual and reported feedstock inventory by July 19, 2007 at the latest. Further, defendant Hsieh, chairman of the Audit Committee of LDK's Board of Directors, was aware of these concerns by September 25, 2007 at the latest.

55.    Mr. Situ also discussed with defendant Lai the discrepancy between the 29.6MW of solar wafers reported sold for the first quarter of 2007 in the May 11 Form F-1 and the 39.6MW reported internally for the same period. In an email to defendant Lai dated May 29, 2007, Mr. Situ wrote that "[t]he financial system book-keeps data based on different documentation . . . . It is quite common and too often that data and reports cannot be reconciled. . . . Nobody knows which figure is true and fair and which one is reliable. Neither the 29.6MW nor 39.6 MW could be validated by anyone."

56.    In addition, defendant Sarno, LDK's Vice President of Manufacturing and plant manager, was aware as early as August 2007 of the possibility that only a fraction of LDK's feedstock inventory was of sufficient quality for use in the manufacture of silicone wafers.

57.    While he was LDK's Financial Controller, Charley Situ repeatedly called attention to the discrepancy between the Company's actual and reported feedstock inventory. In emails to defendant Sarno, dated August 9, 2007, Charley Situ expressed concern about the amount of LDK's feedstock inventory that was of sufficient quality for use in the manufacture of

silicone wafers.  Mr. Situ wrote that "[a]lthough the LDK feedstock inventory looks big, it [often

lacks] raw material for production," and "[w]hat worries [me] is how many useful feedstock [is]

in the inventory (the book value is $174M excluding MEMC).  Nobody knows."

> 58.     In an email to defendant Lai, dated September 10, 2007, Mr. Situ wrote:

> You may recall . . . a meeting with you . . . and me on July 19, 2007 asking for
> help with the following issues:
> ● Although the LDK feedstock inventory looks tremendous, it often lacks of raw
> material for production.
> ● PMC and plant manager cannot base on the book inventory to plan the
> production because in many cases data is just paper number and there are no items
> physically existing or just some unusable items.
> ● Nobody is sure if there is some usable feedstock and how many.

*  *  *

> The ERP team, the finance personnel, the IBM consultants and the warehouse
> have discussed several times in this regard.  The fact is that among the LDK
> feedstock only a small percentage is good stock.

> **According to US GAAP (ARB 43 Ch.4; APB 28, etc.), the management
> should make provision in this regard.  In fact, nobody knows if LDK is
> profitable or not.**  (Emphasis added.)

> 59.     Moreover, on September 25, 2007, in an email to defendants Lai and Hsieh,

chairman of the Audit Committee of LDK's Board of Directors, as well as to others, including

the SEC and the Public Company Accounting Oversight Board ("PCAOB"), Mr. Situ wrote:

> **You may recall that I have reported to you several times that LDK's
> financial system and financial date are not reliable and there are critical
> discrepancies between the actual operation and the financial statements
> released; and there is tremendous obsolete feedstock,** too. . . .

> A financial analysis & internal audit as of August 31 have been done and there are
> some critical findings as follows:

*  *  *

–13–

3.    The warehouse feedstock ledger is basically verified, which is vouched with and consistent to the physical feedstock. (warehouse book—406 tons; USD53.72M)

4.    The accounting general ledger feedstock in warehouse is 614 tons (accounting book: USD99.8M). **There is a discrepancy of 284 tons (USD46.14M).**

5.    The good feedstock or ready-to-be-used feedstock in warehouse is 45 tons (USD7.33M) and 7.34% of the accounting book. **The potential provision may be up to USD92.53M**. . . .

6.    **For the feedstock in warehouse only, the total inflation or provision should be ranged between USD46.14M to 92.53M.**

. . . Many evidence and supporting documents can be found in the warehouse and other operation units, which can not reconcile the accounting books. Most important, the feedstock in the warehouse speaks itself and the physical quantity cannot be manipulated, I am sure KPMG (HK) will verify the same thing and find even more if it performs a professional audit, which is subsequently subject to KPMG (US) review and PCAOB inspection. And although it is a little more difficult to reevaluate the quality, most employees know the fact that there is little good feedstock for production although the "paper number" is tremendous; most of the feedstock is obsolete stock by any criteria in fact.

**LDK is a public company and is required by law to disclose anything material, no matter good or bad; misleading investors would result in serious legal consequences.** You have to use Form-6K to announce the discrepancy or possible restatement within 4 days by securities law. (Emphasis added).

60.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding LDK, their control over, and/or receipt and/or modification of LDK's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LDK, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

61.  During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated LDK's stock price and operated as a fraud or deceit on Class Period purchasers of LDK stock by grossly misrepresenting

the company's inventory. When the truth concerning LDK's inventory entered the market beginning October 3, 2007, LDK's stock price fell drastically.

62. On October 3, 2007, Piper Jaffray issued a research note disclosing allegations of inventory discrepancies at LDK. As a result of this revelation, LDK's stock price declined 24%, from $68.31 to $51.65 per ADS. Moreover, the day of this announcement, the trading volume of LDK's stock was extremely high: 8,794,800 shares were traded on October 3, 2007, compared to an average trading volume of 4,670,000.

63. On October 4, 2007, LDK confirmed that allegations of inventory discrepancies had been made. As a result of this confirmation, LDK's stock price declined 6.5%, from $51.65 to $48.30 per ADS. Moreover, the day of this announcement, the trading volume of LDK's stock was extremely high: 21,030,600 shares were traded on October 4, 2007, compared to an average trading volume of 4,670,000.

64. On October 8, 2007, BARRON's reported additional information regarding the Company's inventory problems, including shortages of usable feedstock. As a result of these additional revelations, LDK's stock price declined 26.4%, from $50.95 to $37.50 per ADS. Moreover, the day of this announcement, the trading volume of LDK's stock was extremely high: 26,032,000 shares were traded on October 8, 2007, compared to an average trading volume of 4,670,000.

65. It was reasonably foreseeable that this materialization of an undisclosed risk regarding LDK's substantial inventory problems would cause the price of LDK's stock to drop precipitously.

66. The 45% total decline in LDK's stock price at the end of the Class Period was a

direct result of the defendants' fraud finally being revealed to investors and the market. The timing and magnitude of LDK's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or company specific facts unrelated to defendants' fraudulent conduct. Defendants' misrepresentations during the Class Period were the proximate cause of plaintiff's losses.

## FIRST CLAIM

### For Violations Of Section 10(b) Of
### The Exchange Act And Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

67.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.  During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase LDK securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

69.  Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LDK securities in violation of Section 10(b) of the Exchange Act

–16–

and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of LDK as specified herein.

71. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LDK and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of LDK securities during the Class Period.

72. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's

management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

73.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LDK's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LDK securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of LDK's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during

the Class Period, Plaintiff and the other members of the Class acquired LDK securities during the Class Period at artificially high prices and were damaged thereby.

75.  By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

76.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

77.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.  Defendants Peng, Tong, and Lai acted as controlling persons of LDK within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants Peng, Tong, and Lai had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Defendants Peng, Tong, and Lai were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or

–19–

cause the statements to be corrected.

79. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

80. As set forth above, LDK and defendants Peng, Tong, and Lai each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants Peng, Tong, and Lai are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

–20–

Plaintiff hereby demands a trial by jury.

Dated: December 11, 2007
      New York, New York

                                **MURRAY, FRANK & SAILER LLP**

By: _____
                          Brian P. Murray (BM 9954)
                          Brian D. Brooks (BB 7442)
            275 Madison Avenue, 8th Floor
            New York, NY 10016
            Telephone: 212/682-1818
            Facsimile: 212/682-1892

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2007, I served the foregoing **AMENDED CLASS ACTION COMPLAINT** via first class mail on the following:

- **Catherine A. Torell**
  Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
  150 East 52nd Street
  New York, NY 10022

- **William Bernard Federman**
  Federman & Sherwood
  10205 N. Pennsylvania
  Oklahoma City, OK 73102

- **Xiaofeng Peng**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Xingxue Tong**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Liangbao Zhu**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Yonggang Shao**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Gang Wang**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Louis T. Hsieh**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Jack Lai**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Nicola Sarno**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Yuepeng Wan**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Rongqiang Cui**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Pietro Rossetto**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

- **Qiqiang Yao**
  Hi-Tech Industrial Park
  Xinyu, JNG  338032
  The People's Republic of China

_____
Brian D. Brooks